**Thomas MASON, Appellant,**

v.

**FARMERS INSURANCE COMPANIES, Respondent.**

**No. 48405.**

Supreme Court of Minnesota.

May 18, 1979.

Rehearing Denied July 9, 1979.

Dorsey, Windhorst, Hannaford, Whitney & Halladay, Roger J. Magnuson, and J. David Jackson, Minneapolis, for appellant.

Rider, Bennett, Egan & Arundel, William T. Egan, and Scott K. Goldsmith, Minneapolis, for respondent.

Heard before SHERAN, C. J., KELLY, and YETKA, JJ., and considered and decided by the court en banc.

KELLY, Justice.

This case arose from Farmers Insurance Companies' (hereinafter Farmers) termination of a District Manager Contract between Farmers and Thomas Mason. Mason filed suit against Farmers for wrongful termination. Farmers moved for summary judgment and the motion was granted by the trial court. Mason appeals. We affirm.

Thomas Mason began working for Farmers in 1954 as an adjuster in the claims department. In 1962, encouraged by Farmers, Mason purchased a Farmers District Sales Office from Paul F. Deaven, a retiring Farmers District Manager, for $27,890. Five days later, Farmers and Mason entered into a "District Managers Appointment Agreement." Under the agreement Farmers promised to pay Mason in accordance with the scales and rules adopted from time to time by Farmers; and Mason agreed to recruit and train agents, collect and transmit premiums, and handle and settle claims. The contract was to have a contract value which was stated as five times his commission over the latest 6 months. Also, he could sell his position as his predecessor had done.

In 1964, as part of an attempt to increase sales, Farmers developed the Agency Development Plan. The plan was designed to prevent district managers from competing with their agents by not allowing them to collect insurance commissions on direct sales to the public or renewals of policies originally sold by agents who had since quit. The plan involved a cut in the expenses a district manager would incur as well as a cut in the percentage commission rate the district manager would collect on his agents' sales.

On February 23, 1965, Mason and Farmers entered into a new agreement in accordance with the Agency Development Plan. Because Mason's percentage commission rate was cut, his contract-value multiple was increased to maintain his old contract value. Had he failed to sign the new contract, his contract value would have declined. Mason contends he signed the agreement under duress.

Both of Mason's contracts contained essentially the same termination clause:

"This Agreement shall terminate upon the death of the District Agent and may be cancelled without cause by either the District Agent or the Companies on 30 days written notice * * *."

On September 27, 1974, Farmers mailed to Mason a notice of termination which stated that it would be effective November 1, 1974. Mason received the notice between October 1 and October 4, 1974.

Mason filed suit and sought and received a temporary restraining order against Farmers. Thereafter Mason moved for a temporary injunction, but this was denied and the temporary restraining order was thereupon dissolved. Mason did not appeal this decision but did proceed with his suit.

On this appeal Mason argues that summary judgment should not have been granted on his claims of unconscionable termination of contract, bad faith termination of contract, and wrongful termination of franchise; and that issues of fact existed which should have been submitted to a jury.

■ Mason argues that the termination and contract value clauses are void as unconscionable in view of his allegations of the manner in which he was forced to sign the agreement, his subsequent profitable performance on behalf of the company and the resultant gross understatement of his equity in the contract value clause.

■ Any claims of duress can be disregarded in view of the 9-year interval between the signing of the contract and the initiation of this suit, as well as the plaintiff's acceptance of benefits under the contract for such a length of time. Williston, Contracts, § 1624; *Diffenderfer v. Heublein, Inc.*, 412 F.2d 184 (8 Cir. 1969). Cf. *Proulx v. Hirsch Bros. Inc.*, 279 Minn. 157, 155 N.W.2d 907 (1968) (acceptance of contractual benefits vitiates defense of fraud). Similarly, Mason's subsequent profitable performance cannot be considered. When Mason accepted the termination value of the contract in 1962 (five times his service

commissions over the immediately previous 6 months), there was no indication that this amount would not· be reasonable. It was designed to reflect the value of the policy renewals which would continue even after he had left Farmers. When Mason signed the 1964 agreement, the valuation was changed to reflect an equal contract value in view of decreased commission percentage rates. Farmers always had the right, under the contract, to lower the commission percentage rate. Neither the fact that Mason's commission percentage rate was lowered in 1964 nor the fact that his successors received an even lower percentage is indicative of duress, fraud, or misappropriation. It is unquestioned that Mason's income rose and his contract value increased greatly between 1962 and 1974. Upon termination Mason received $120,929.88 to pay off his contract value.

Mason relies heavily on *Pickerign v. Pasco Marketing, Inc.*, 303 Minn. 442, 228 N.W.2d 562 (1975). In *Pickerign* a service station operator held a lease and a dealership agreement with an oil company that terminated the agreement under a 30-day without-cause clause after 16 years. Upon expiration of the lease and dealership and failure of the oil company to deliver more gasoline, the station operator sought a temporary restraining order. Because he had allowed the dealership to expire before seeking a temporary restraining order, he did not receive a temporary restraining order as to the dealership agreement. We did, however, grant the temporary restraining order as to the lease agreement since the plaintiff was in possession of the station. In granting the order, we implied that the operator was entitled to the relief. See, Minn.St.1971, § 585.02. In *Pickerign*, however, the contracts provided absolutely no protection to the station operator beyond 30-day notice. Any goodwill value the operator had built up would be lost upon termination. In the present case, Farmers provided Mason with a substantial contract value to protect his rights upon termination with or without cause.

■ Mason also argues that Farmers' termination of his contract was done in bad faith so as to give Mason a cause of action against Farmers. Minnesota does not recognize bad faith termination of contract as giving rise to a cause of action independent of a contract action. *Wild v. Rarig*, 302 Minn. 419, 234 N.W.2d 775 (1975).

■ Mason contends that the "good faith" implied in sales contracts should be carried over to all contracts. See, Minn.St. 336.1–203. However, when a contract states that it may be terminated without cause, then unconscionability, not good faith, is the issue. See Gellhorn, *Limitations on Contract Termination Rights-Franchise Cancellations*, 1967, Duke L.J. 465, 498–509. But see Summers, *Good Faith in General Contract Law and the Sales Provisions of The Uniform Commercial Code*, 54 Va.L.R. 195, 251 (1969).

Mason cites *Skagerberg v. Blandin Paper Co.*, 197 Minn. 291, 266 N.W. 872 (1936), as establishing a cause of action for bad faith termination. In dicta that case stated that where an employee purchases the right to employment from his employer with good consideration other than his services, then his employment cannot be terminated without good cause. In the present case no consideration was given to Farmers by Mason other than his services. Mason also relies on *Haase v. Stokely-Van Camp, Inc.*, 257 Minn. 7, 99 N.W.2d 898 (1959). In *Haase* a canner was held liable for damages because it did not allow a grower to complete his contract with the canner by delivery. This case does not bring up the issue of good faith but rather of preventing another's performance.

■ Mason also argues that his contract termination was in violation of the Minnesota Franchise Act. There is a question as to whether or not Mason's District Manager Agreement was a franchise under Minnesota law. We need not reach that issue, however, since it is clear that the Minnesota Franchise Act did not cover the present situation.

Mason alleges that Farmers violated Minn.St. 80C.14 of the Minnesota Franchise Act which provided that:

"No person, whether by means of a term or condition of a franchise or otherwise, shall engage in any unfair or inequitable practice in contravention of such rules as the commissioner may adopt defining as to franchises the words 'unfair and inequitable.' Any violation of this section is enjoinable by a court of competent jurisdiction."

Mason relies on a rule promulgated under that section which requires good cause for any franchise termination as well as 60 days notice. Minn.Reg. SDiv 1714(e, f). This rule was filed with the Secretary of State and the Commissioner of Administration on January 13, 1975, over 2 months after Mason's termination. Mason argues that it should be given retroactive effect in this case.

■ Prior to July 1, 1975, Minn.St. 15.-0413 provided that every rule " * * * shall have the force and effect of law upon its publication in the state register and upon its further filing in the office of the commissioner of administration." In principle, rules may be made retroactive if it is reasonable to do so. See, *Summit Nursing Home, Inc. v. United States*, 572 F.2d 737 (Ct.Cl.1978). But Minn.St. 15.0413 does not specifically provide for retroactivity of this rule in this case; nor does the Minnesota Franchise Act or the rule itself. Minnesota laws are presumed to have no retroactive effect unless clearly and manifestly intended by the legislature. Minn.St. 645.21. No lesser standard should be applied to rules promulgated under statutory authority.

■ Even assuming a violation of Minn.St. 80C.14 and the regulations thereunder, Mason does not have an action for money damages. Minn.St. 80C.17 ruled out the possibility of damages as a recovery when it stated:

"Except as explicitly provided in this section, no civil liability in favor of any private party shall arise against any person by implication * * * of sections 80C.01 to 80C.22 or any rule or order thereunder * * *."

Section 80C.14 provided its own remedy:

" * * * Any violation of this section is enjoinable by a court of competent jurisdiction."

Mason was denied a temporary injunction and chose not to pursue an appeal of that denial under Rule 103.03(b) Rules of Civil Appellate Procedure.

■ Finally Mason argues that an issue of fact is presented as to whether he received 30 days notice before termination. The contract termination date was October 31, 1974. Notice was sent September 27, 1974, but was apparently mis-sent by the U. S. Mail and was postmarked a second time September 30, 1974 at Houston, Minnesota. At deposition Mason agreed that he had probably received notice of termination on October 1 or October 2, 1974. In an earlier deposition defendant's counsel asked plaintiff's counsel whether timeliness of notice was an issue and was told, "Not that I am aware." Later Mason's counsel indicated that he did not mean to jeopardize his rights with respect to the timeliness issue if the franchise provisions should be inapplicable and the case would have to be decided on contract grounds.

The possible failure to have given Mason 30 days notice is unrelated to the three causes of action his complaint alleges. Mason is attempting to strike down the termination provision itself, not to show a violation of it. In view of the circumstances, lack of notice would not, in itself, be evidence of bad faith, wrongful termination of franchise, or unconscionable termination of contract. There is no indication in the complaint or depositions that Mason is suing for any damages which are the result of not getting one or two more days of notice.

Mason also contends that there are other questions of fact which should have been submitted to a jury. We have carefully examined his claims and find them to be without merit.

Affirmed.

OTIS, J., took no part in the consideration or decision of this case.